**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **MICHAEL J. MAINARDI, <u>ET AL.</u>,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PRUDENTIAL INSURANCE CO. OF** | : | |
| **AMERICA,** | : | |
| **Defendant** | : | **NO. 08-3605** |

<u>**MEMORANDUM AND ORDER**</u>

Pratter, J.                                                                                    January 30, 2009

Michael J. Mainard, Gerard N. Mainardi, and Lighthouse Strategic Projects Group, Inc.

claim that Prudential Insurance Company of America violated the copyright and breached the

software license agreement for products Plaintiffs had developed for marketing insurance and

financial services.  In addition, Plaintiffs assert state claims for misappropriation of trade secrets,

unfair competition, and intentional interference with prospective contractual relations.

Prudential has moved to dismiss all claims, arguing that (1) Plaintiffs' claim for copyright

infringement seeks protection of ideas, not the original elements of the works protected by the

Federal Copyright Act; (2) Plaintiffs' state law claims are preempted by federal law; and (3)

Plaintiffs have not properly pleaded their state law claims.

For the reasons set forth below, Prudential's Motion is granted as to Count III

(Misappropriation of Trade Secrets) and Count V (Intentional Interference with Prospective

Contractual Relations), denied without prejudice to reassert at a later stage in the litigation as to

Count IV (Unfair Competition), and denied in all other respects.

1

## I.    FACTUAL BACKGROUND

Messrs. Mainardi claim to have extensive experience producing "product-based sales materials and marketing tools for the insurance and financial industries."  Compl. ¶ 10.  In 1995, they formed Lighthouse Strategic Projects Group, a partnership that undertook an 18-month analysis of marketing techniques used in those fields.  The Mainardis hoped to develop innovative marketing strategies using the results of their analysis.  Id.  Lighthouse Strategic Projects Group was the predecessor of Lighthouse Strategic Projects Group, Inc. ("Lighthouse").

Using what they learned from their industry analysis, the Mainardis developed "a tool to educate and emotionally motivate customers via audiovisual vignettes designed to demonstrate how a lack of planning could put the potential customers' business and personal finances at risk."  Compl. ¶ 15.  They named the new product "businessKillers," and on July 20, 1998, the Mainardis copyrighted businessKillers in accordance with the federal copyright law.  The copyright claimed "Text and Audiovisual Material."  Id. ¶¶ 15-16.  See id., Ex. 1.  The Mainardis continued work on their products and developed "businessKillers Extended Market," a CD-ROM specifically targeted at women.  They copyrighted businessKillers Extended Market on October 29, 2003 as an "audiovisual work."  Id.  ¶¶ 17-18.  Finally, the Mainardis developed "Family Matters," an interactive CD-ROM with companion written materials "aimed at marketing insurance and financial services products to closely-held business owners."  Id.  ¶ 19.  They copyrighted Family Matters on October 31, 2003.

The software for businessKillers and Family Matters ("the businessKillers package") contains license agreements that each user must accept upon installation by clicking a button that says, "I ACCEPT."  A user cannot gain access to the software without clicking this button.  Id. ¶

2

21.  See id., Ex. 4 (license agreements for businessKillers and Family Matters).  The license

agreements on Lighthouse's copyrighted CD-ROMs read as follows:

> 1. Grant of License.  The...Software...and the related materials are licensed to you by
> Lighthouse Strategic Projects Group in accordance with the terms hereof.  The
> Software and...trademarks, product names, documentation, and support materials are
> owned by Lighthouse Strategic Projects Group, Inc.  Except to the extent explicitly
> stated in this Agreement, Lighthouse SPG reserves any and all right, title, and interest
> in and to the Software and...trademarks, product names, documentation, and support
> materials.
> [A] The Software may be used only on one single computer, by one user at a time.
> [B] You may use the Software for...workshop presentations. Permitting unauthorized
> users access to the Software is a violation of this Agreement.
> [C] You may not transfer, assign, or sublicense the Software to another party.
> [D] You may not copy or reproduce in any form the user documentation provided
> with the software.  Only marketing and support materials provided and authorized
> through Lighthouse SPG may be used in conjunction with the software.  You may not
> create and/or use your own marketing materials without prior written authorization
> from Lighthouse SPG.

Compl., Ex. 4.  The license agreements were effective until terminated, but they provided that a

user could "terminate this Agreement at any time by returning the Software along with a written

notice of termination."  Id.

The Mainardis, on behalf of Lighthouse, sought to market the businessKillers package "to

independent insurance agents, financial and insurance marketing firms, financial planners and

major insurance companies." Compl. ¶ 21.  In June 2005, they began marketing the

businessKillers package to Prudential.  The following month, an officer of Prudential informed

the Mainardis that she wanted more information about the programs and a demonstration.  Id. ¶

23.

The Mainardis repeatedly presented the businessKillers package to Prudential employees

and to officers of Prudential's affiliates in 2005 and 2006.  "Prudential also asked [the

3

Mainardis] to provide it with hours of explanation and instruction in the use of the copyrighted interactive audiovisual products and texts, and the various theories behind its development. [The Mainardis] complied with [] Prudential's requests."  Id. ¶ 24.  Prudential agreed to keep confidential all information received from the Mainardis during this period.  Id.

By February 2006, Prudential had told the Mainardis that it wanted to enter into a license agreement for the distribution of the businessKillers package, including the copyrighted CD-ROMs and written materials.  Before and during the related negotiations, Plaintiffs provided Prudential with numerous copies of the materials from the businessKillers package.  Id. ¶ 25. Plaintiffs assert that "[e]ach time that an agent or employee of Prudential installed the copyrighted audiovisual materials he or she necessarily first accepted the terms required by the software License Agreements for the businessKillers package."  Id. ¶ 26.

After lengthy negotiations, Lighthouse and Prudential reduced a distribution license agreement to writing.  The agreement requires Prudential to pay Lighthouse $300,000 per year for three years for distribution rights of the businessKillers package plus $3,000 per year for each person to whom Prudential distributed the package.  "Prudential informed Plaintiffs that it expected to distribute the copyrighted software and materials contained in the businessKillers package to over 1,000 agents/affiliates.  Plaintiffs were assured that their requested revisions unrelated to the terms were underway and a final Agreement would be reached."  Compl. ¶ 29. Prudential then required that the businessKiller package materials be submitted to its compliance department "for review and assignment of internal 'IFS' numbers signifying approval for public distribution."  Id. ¶ 30. After receiving approval from the compliance department, Lighthouse revised the businessKiller package to meet Prudential's requirements.  Id.

4

Throughout the spring of 2006, Prudential communicated to Lighthouse that there were delays and slight problems.  Compl. ¶ 31.  In June 2006, Prudential presented a revised contract to Lighthouse that did not include requested changes.  "As a result the parties failed to reach a meeting of the minds and the contract negotiations met with an impasse.  Consequently the anticipated business relationship between the parties never materialized."  Id. ¶ 32.  However, Prudential did not return to Lighthouse any of the businessKillers package software or written materials.  Id.

"[O]ne year later, in June 2007, Prudential released a substantially similar copy of the Plaintiffs' businessKillers package entitled 'Prudential's Tipping Points' containing an interactive CD-ROM presenting Plaintiffs' unique, educationally focused, marketing strategy in the same format of audiovisual vignettes presenting a problem and a solution through a financial consultant/expert along with companion written materials including 'Balance Check' containing a substantially similar 'yes/no' test for the consumer to analyze in substantially the same way his/her business risk and determine for the agent and the customer his/her particular insurance and financial services needs."  Compl. ¶ 33.  Plaintiffs assert that Prudential's Tipping Points is substantially similar to Plaintiffs' businessKillers package in the following ways:

    a.  Prudential's Tipping Points is comprised of an interactive CD-ROM with accompanying printed materials;

    b.  Prudential's Tipping Points contains a self-assessment written test booklet to ascertain each business owner's risk in each topic addressed in the CD-ROM presentation in a "yes/no" format;

    c.  Prudential's Tipping Points content focuses on nearly identical topics/discussion points for each video-vignette;

    d.  Prudential's Tipping Points interactive CD-ROM offers a subject-matter expert/consultant after each vignette to present potential solutions to the business-owner;

    e.  Prudential's Tipping Points is positioned as an "executive briefing" rather than as

a seminar;

    f.    Prudential's Tipping Points interactive CD-ROM contains emotionally charged video vignettes illustrating typical mistakes of business-owners;

    g.    Prudential's Tipping Points online brochure contains substantially similar verbiage to describe the program;

    h.    Prudential's Tipping Points format is substantially similar to the businessKillers package's format offering:

        (i)    an interactive CD-ROM;

        (ii)    short video vignettes that do not discuss any product but rather identify critical decision points in the life of a closely-held business;

        (iii)    a video discussion of outcomes and solutions for each vignette;

        (iv)    an expert/consultant segment; and

        (v)    a "yes/no" risk assessment test in written form to the business owner.

    i.    Prudential's Tipping Points, like businessKillers online program, can be customized to reflect a specific audience/person's name;

    j.    Prudential's Tipping Points allows its user to select the order of topics to be viewed prior to running the program;

    k.    Much of the dialogue contained in Prudential's Tipping Points vignettes is substantially similar to the dialogue contained in the businessKillers package's vignettes;

    l.    Prudential's Tipping Points contains a disabling device where the application stops functioning after a set number of days; and

    m.    Prudential's Tipping Points is positioned in the marketplace, including printed materials associated with promotion of Prudential's Tipping Points, in a substantially similar way as the businessKillers package.

Compl. ¶ 35.

Prudential has distributed and continues to distribute Tipping Points to Lighthouse's potential customers for financial gain.  Id. ¶ 36.


## II.    DISCUSSION

### A.    The Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P.

8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quoting Conley, 355 U.S. at 47).  While a complaint need not contain detailed factual allegations, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 1964-65 (citations omitted).  Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 1965 (citations omitted).

To make such a determination, courts "must only consider those facts alleged in the complaint and accept all of those allegations as true."  ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).  See also Twombly, 127 S. Ct. at 1965 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)").  The Court also must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party.  Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989).  The Court, however, need not accept as true "unsupported conclusions and unwarranted inferences," Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions."  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

To evaluate a motion to dismiss, the Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice.  See Tellabs, Inc. v. Makor Issues & Rts., 127 S. Ct. 2499, 2509

(2007); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

 

      **b.**    **Copyright Infringement**

      To assert a claim for copyright infringement sufficiently under the Federal Copyright Act, 17 U.S.C. § 101 *et seq.*, Lighthouse and the Mainardis must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991).  Prudential does not challenge Plaintiffs' ownership of a valid copyright, so the Court will consider only the second requisite element of the copyright infringement claim.

      The Copyright Act protects "original works of authorship fixed in any tangible medium or expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  Such protection extends to written works as well as audiovisual works.  Id.  However, copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery."  17 U.S.C. § 102(b).  "It is axiomatic that copyright does not protect ideas, but only expressions of ideas."  Whelan Assoc., Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222, 1234 (3d Cir. 1986).

      Prudential argues that the Court should dismiss the copyright infringement claim because Plaintiffs "seek copyright protection for marketing approaches that are not entitled to such protection," namely, ideas rather than expressions.  Motion at 7.  Prudential also asserts that Plaintiffs fail to provide factual allegations to support the assertion that Prudential's products are

substantially similar to Lighthouse's copyrighted products.  Motion at 8.  Lighthouse and the Mainardis respond by asserting that they "do not seek copyright protection for their idea on how to market insurance through emotional motivation and education.  Rather, [they] have sought copyright protection for the expression of that idea contained in the registered original text and audiovisual materials they claim Defendant copied in its Tipping Points product."  Response at 5.

        As part of their claim for infringement, Lighthouse and the Mainardis assert that "Prudential's Tipping Points online brochure contains substantially similar verbiage [the Plaintiffs use] to describe the program," and that "[m]uch of the dialogue contained in Prudential's Tipping Points vignettes is substantially similar to the dialogue contained in the businessKillers package's vignettes."  Compl. ¶ 35(g), (k).[1]  Prudential maintains that such verbiage is not "what Plaintiffs seek primarily to protect," as demonstrated by the fact that they "dedicate only two sentences in their entire Complaint to these specific allegations."  Motion at 14.  Accordingly, Prudential argues that "these allegations are of only marginal importance to Plaintiffs and the subject matter therefore is not 'of value' to them."  Id. (citing Atari, Inc. v. North American Phillips Comsumer Electronics Corp., 672 F.2d 607, 619 (7th Cir. 1982) (In order for there to be a finding of infringement, the similarity must "relate to a substantial portion of plaintiffs' work – i.e., matter which is of value to plaintiffs."))  Lighthouse and the Mainardis respond that "[c]learly the literal expression of [their] works – the verbiage of the text (written materials) and dialogue of the audiovisual materials – are of importance to the expression of

---

        [1] Because these two allegations are sufficient to support a claim for copyright infringement, as explained below, the Court will not consider at this time whether the remaining allegations made in the claim for copyright infringement have merit.  Such a determination may be better made following discovery.

[their] ideas." Response at 10-11.

Prudential's guesswork about the importance of various subsections of Plaintiffs' copyright infringement claim is misplaced. The Court must consider only whether Plaintiffs have indeed pleaded a valid claim. Lighthouse and the Mainardis have asserted substantial similarity of the verbiage and dialogue between the infringing and copyrighted works, and such an assertion states a claim for copyright infringement. See Feist Pubs., 499 U.S. at 361.

Prudential argues that even if Plaintiffs' claim may appear facially valid, it is "insufficient" and a mere "formulaic recitation of the element of a cause of action" in violation of Twombly. Motion at 15. Because "substantial similarity" is an element of a copyright infringement claim, "Plaintiffs' Complaint must provide some grounds for the conclusion that the dialogue and verbiage are 'substantially similar,'" but does not, according to Prudential. Id. Twombly requires a "plain statement" setting forth a claim "showing that the pleader is entitled to relief." 127 S.Ct. at 1966. The Third Circuit Court of Appeals has held that "in light of Twombly, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

Taken as a whole, the Court concludes that Plaintiffs' Complaint does "show" the basis for their assertion of an entitlement to relief. Lighthouse and the Mainardis carefully lay out how Prudential allegedly accessed their products and copied those products in both concept and wording. Plaintiffs warn Prudential of infringing material in both Prudential's online brochure and the dialogue of its vignettes, very specific locations. Compl. ¶ 35(g), (k). Such allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct at 1965).

10

Because Plaintiffs' have set forth a sufficient claim for copyright infringement, the Court will not dismiss this claim.

### c.       Breach of Contract

Lighthouse and the Mainardis have asserted a claim for breach of contract based on alleged breaches of the software license agreements in the businessKillers package.  Compl. at 13.  Such agreements are supposed to protect Lighthouse's "right, title, and interest in and to the Software and...trademarks, product names, documentation, and support materials;" prohibit the copying or reproduction of the "user documentation provided with the Software;" and disallow the creation of marketing materials to be used with the software.  Compl., Ex. 4.

### i.       Preemption

A state law intellectual property claims may be preempted by a federal laws, such as the Federal Copyright Act.  See Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993) (discussing preemption in cases where state law rights asserted are equivalent to the exclusive rights protected by federal copyright law).  Prudential argues that Plaintiffs' claim for breach of contract is preempted by federal law because the claim asserts rights protected under federal law. However, "if a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action." Dun and Bradstreet Software Servs. v. Grace Consulting, Inc., 307 F.3d 197, 217 (3d Cir. 2002) (quoting Data Gen. Corp. Grumman Sys. Support Corp.,

11

36 F.3d 1147, 1164 (1st Cir. 1994)).

The Third Circuit Court of Appeals applies the "'extra element' standard in determining issues of equivalence generally," though not yet in the context of breach of contract claims. Tartan Software, Inc. v. DRS Sensors & Targeting Sys., 2007 U.S. Dist. LEXIS 75657, at *12-13 (W.D. Pa. Oct. 11, 2007). However, district courts within the circuit have agreed that an extra element exists in a breach of contract claim that is not present in a claim for copyright infringement: a promise by the defendant. Id. See, e.g., MCS Servs. v. Johnsen, 2002 U.S. Dist. LEXIS 16910 (E.D. Pa. Aug. 13, 2002). Further, the Courts of Appeal for the Sixth and Ninth Circuits have held that a promise to pay distinguishes a breach of contract claim from a copyright infringement claim. See Stromback v. New Line Cinema, 384 F.3d 283 (6th Cir. 2004); Grosso v. Miramax Film Corp., 383 F.3d 965 (9th Cir. 2003). Because Plaintiffs have alleged that Prudential made promises by accepting the license agreements and because, at this stage in the litigation, the Court must accept as true the factual allegations in the Complaint as well as any reasonable inferences, the Court finds that Plaintiffs have pleaded a claim for breach of contract that is not automatically preempted.

### ii.     Elements of a Claim for Breach of Contract

Pursuant to Pennsylvania law, the elements required to establish a breach of contract claim are (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003); J.F. Walker Co., Inc. v. Excaliber Oil Group, Inc., 792 A.2d 1269, 1272 (Pa. Super. 2002). Prudential challenges Plaintiffs' claim for failing to meet the first two elements.

Prudential first asserts that Plaintiffs' Complaint does not adequately allege the existence of a valid contract because it fails to allege acceptance of the license agreements by Prudential. Prudential argues that the Complaint states only that Plaintiffs conducted presentations of the businessKillers package to Prudential employees.  This, Prudential asserts, suggests that the Mainardis, not Prudential's employees or agents, opened the computer programs and accepted the licensing terms when demonstrating the software.  See Motion at 19-20.  However, the Complaint states that "Prudential was provided with numerous copies of the copyrighted CD-ROMs and accompanying written materials comprising the businessKillers package," and that "[e]ach time that an agent or employee of Prudential installed the copyrighted audiovisual materials he or she necessarily first accepted the terms required by the software License Agreements."  Compl. ¶¶ 25, 26.  Further, the Complaint asserts that Prudential used the software in situations other the workshop presentations, Compl. ¶ 42, which suggests that Prudential's employees or agents accessed the software independently and, necessarily, accepted the license agreements.  Accordingly, drawing all reasonable inferences from the Complaint, the Court finds that Plaintiffs have sufficiently pleaded the existence of a valid contract.

Prudential next challenges the breach of contract claim for failure "to allege any facts to suggest that Prudential" breached the license agreements.  Motion at 20.  Prudential maintains that Plaintiffs' claim is based on the assertion that they created a "unique marketing approach to insurance that no one, including Prudential, was permitted to emulate."  Id.  Prudential asserts that the Complaint nowhere alleges violation of "Plaintiffs' ownership interest in 'trademarks, product names, documentation, and support materials' related to their products."  Motion at 21.

 The license agreements protect Lighthouse's interest in both the software itself and the

trademarks, product names, documentation, and support materials, including all user documentation. See Compl., Ex. 4. Although the "unique marketing strategy" contained in the businessKillers package and any related subject matter does not appear to be protected by the license agreements' software-specific language, other rights are. Plaintiffs have alleged breaches of such rights in their Complaint. For example, Plaintiffs allege that Prudential "copied and/or reproduced the user documentation provided with the businessKillers package's software," an act explicitly prohibited by Section 1[D] of the license agreement. Compl. ¶ 42(g). Accordingly, under a reasonable reading of Plaintiffs' claim for breach of contract, Lighthouse and the Mainardis could be entitled to relief.

Prudential argues that Plaintiffs' claim for breach of contract still must be dismissed for failure to "go beyond mere formulaic recitations." Motion at 21. In particular, Prudential maintains that Plaintiffs' claim must be dismissed for failing to provide explicit "comparison to suggest that the user documentation for the products is similar." Id. Again Prudential relies on Twombly; however, the Third Circuit Court of Appeals continues to allow liberal pleading standards. Plaintiffs need only provide "fair notice" and the "grounds" on which a plausible claim rests in order to survive dismissal. Phillips, 515 F.3d at 331 (citing Twombly, 127 S.Ct. at 1964). Because Lighthouse and the Mainardis have provided Prudential with fair notice of the basis for their breach of contract claim, the Court will not dismiss the claim.

### d. Misappropriation of Trade Secrets

Lighthouse and the Mainardis also allege that Prudential misappropriated their trade

secrets by manufacturing and distributing the Tipping Points software, which, Plaintiffs

contend, contained Plaintiffs' trade secrets.  Compl. at 15-16.  Prudential argues that Plaintiffs

have failed to allege facts that would establish the existence of a valid trade secret.  Motion at

22.

The elements of the tort of misappropriation of trade secrets are: "(1) the existence of a

trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3)

use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff."  Moore v.

Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2002).  Under Pennsylvania law, a

trade secret consists of "any formula, pattern, devise or compilation of information which is

used in one's business, and which gives him an opportunity to obtain an advantage over

competitors who do not know or use it."  Prudential v. Stella, 994 F. Supp. 318, 323 n.2 (E.D.

Pa. 1998).  In order to constitute a trade secret under Pennsylvania law, information must

"[d]erive[] independent economic value...from not being generally known to, and not being

readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use."  12 Pa. C.S.A. § 5302.  Factors used in determining whether given

information is a trade secret include:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985).  Prudential asserts

that Plaintiffs have failed to allege facts that would establish the existence of a trade secret.

Motion at 22.

In interpreting Michigan's trade secrets law, which contains language identical to that used in Pennsylvania's Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301 *et seq*, the Sixth Circuit Court of Appeals noted that "the essence of a trade secret is that it derives its value from secrecy." Stromback v. New Line Cinema, 384 F.3d 283, 305 (6th Cir. 2004). The court held that a poem and screenplay had no "independent economic value" when held exclusively by their creator. Rather, they would have "would have 'independent economic value' only if they were exploited publicly through broad dissemination." Id. In essence, the court held that a product cannot constitute a trade secret when it provides its creator with economic value only when disseminated – or, as here, sold – to third parties.

Lighthouse does not assert in its Complaint that it derived independent economic value from the businessKillers package. Rather, Plaintiffs sought economic benefit through the sale of their product to "independent insurance agents, financial and insurance marketing firms, financial planners and major insurance companies." Compl. ¶ 21. Information disclosed to the public cannot be protected as a trade secret. G. Neil Corp. v. Cameron, 2003 U.S. Dist. LEXIS 19509, at *4-5 (E.D. Pa. Oct. 20, 2003). Further, because Plaintiffs were actively marketing their products, the products were " readily ascertainable by proper means by[] other persons who [could] obtain economic value from [their] disclosure or use," and, thus, not the type of information protected under 12 Pa. C.S.A. § 5302. Accordingly, the businessKillers package cannot constitute a trade secret under Pennsylvania law, and the Court will dismiss Plaintiffs' claim for misappropriation of trade secrets.

e.       **Unfair Competition**

Prudential argues that Plaintiff's claim for unfair competition must be dismissed under the doctrine of preemption.  Prudential asserts that Plaintiffs' claim is based solely on reverse passing off, Prudential copying Plaintiffs' work and passing it off as Prudential's own.  Motion at 26-27.

"Unfair competition has been defined by [the Pennsylvania Supreme Court] to be 'anything done by a rival in the same business, by imitation or otherwise, designed or calculated to mislead the public in the belief that, in buying the product offered by him for sale, they were buying the product of another manufacturer, is in fraud of that other's rights, and will afford just ground for equitable interference.'" B.V.D. Co. v. Kaufmann & Baer Co., 272 Pa. 240, 241-242 (Pa. 1922) (quoting Cigar Mfg. Co. v. Cigar Mfg. Co., 222 Pa. 116 (Pa. 1908)).  See Envtl. Tectonics Corp. v. Walt Disney World Co., 2008 U.S. Dist LEXIS 24832 (E.D. Pa. Mar. 26, 2008).  "To prove unfair competition under Pennsylvania common law, 'a plaintiff must show the involvement of goods or services, a false description or designation of origin with respect to the goods or services involved and a reasonable basis for the belief that one has been injured.'" Envtl. Tectonics Corp., 2008 U.S. Dist. LEXIS 24832, at *57 (quoting International Hobby Corp. v. Rivarossi S.P.A., 1998 U.S. Dist. LEXIS 9932 (E.D. Pa. 1998)).  Such common law requirements overlap with federal copyright law, explaining the necessity for preemption, and this District has repeatedly held that federal copyright law preempts such claims for reserve passing off.  See Schiffer Publishing Ltd. v. Chronicle Books, 350 F. Supp. 2d 613, 619 (E.D. Pa. 2004).

Lighthouse and the Mainardis concede that they are not basing their unfair competition

claim on such deception and, in doing so, seem to acknowledge that any such claim would indeed be preempted by federal copyright law.  Specifically, Plaintiffs state, "Plaintiffs do not allege Defendant intended to 'pass off' the product and deceive the public."  Response at 18. Rather, Plaintiffs argue that "they do sufficiently allege a claim under Pennsylvania law based upon Defendant's <u>intention to deceive</u> Plaintiffs to unfairly gain access to and copy Plaintiff Lighthouse's businessKillers package representing 'additional elements' of proof excluding the claim from preemption."  <u>Id.</u> (emphasis in original).

Besides recognizing state claims for unfair competition that parallel federal claims, decisions emanating from this District have recognized the common law definition of unfair competition found in the Restatement (Third) of Unfair Competition:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless...the harm results from...acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.

Restatement (Third) of Unfair Competition § 1(a) (1995).  <u>See</u> <u>Synthes (USA) v. Globus Med., Inc.,</u> 2007 U.S. Dist. LEXIS 50812 (E.D. Pa. July 12, 1007); <u>Bldg. Materials Corp. of Am. v. Rotter</u>, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa. 2008) (listing cases where federal courts acknowledged the definition, but noting that "[t]o date, however, no appellate court in Pennsylvania has applied the Restatement (Third) to the common law tort of unfair competition.")  However, such common law claims are not recognized for all arguably "unfair" behavior.  "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper

inducement of another's employees, and unlawful use of confidential information." <u>Synthes</u>, 2007 U.S. Dist. LEXIS 50812, at *28 (citations omitted).  Lighthouse and the Mainardis admit that their claim is based solely on Prudential's "intention to deceive" *them*, not any deception of the public.  Response at 18.  Read most generously, the Complaint alleges that Prudential misrepresented its intentions in order to gain access to their businessKillers package. <u>See</u> Compl. ¶ 51.

Because no appellate court in Pennsylvania has applied the Restatement (Third) to the common law tort of unfair competition, but courts in the Eastern District of Pennsylvania continue to do so, this Court will deny the motion to dismiss Plaintiffs' "claim of unfair competition without prejudice to be reasserted at a later stage in litigation with the hope that, in the near future, Pennsylvania courts will provide more guidance on this issue." <u>Bldg. Materials Corp. of Am.</u>, 535 F. Supp. 2d at 526 n.4.

### f.  Intentional Interference with Prospective Contractual Relations

Plaintiffs concede that their claim for intentional interference with prospective contractual relations, as set forth in Count V of the Complaint, is "preempted by the Copyright Act in that it is premised solely on Defendant's distribution of its infringing product."  Response at 18.  Accordingly, the Court will dismiss Count V.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Prudential's Motion to Dismiss.  The Court grants the Motion as to the dismissal of Plaintiffs' claims for

Count III (Misappropriation of Trade Secrets) and Count V (Intentional Interference with Prospective Contractual Relations), denies the Motion without prejudice to reassert at a later stage in the litigation as to Count IV (Unfair Competition), and denies the Motion in all other respects.  An appropriate Order consistent with this Memorandum follows.


                                                 BY THE COURT:


                                                 S/Gene E.K. Pratter
                                                 GENE E. K. PRATTER
                                                 UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. MAINARDI, <u>ET AL.</u>,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PRUDENTIAL INSURANCE CO. OF** | : | |
| **AMERICA,** | : | |
| **Defendant** | : | **NO. 08-3605** |

**O R D E R**

AND NOW, this 30th day of January 2009, upon consideration of Defendant's Motion

to Dismiss (Doc. No. 10), Plaintiffs' Brief in Opposition to Defendant's Motion (Doc. No. 15),

and Defendant's Reply (Doc. No. 18), it is HEREBY ORDERED that the Motion is:

1)      GRANTED as to Count III (Misappropriation of Trade Secrets) and Count V

(Intentional Interference with Prospective Contractual Relations);

2)      DENIED without prejudice to be reasserted at a later stage in the litigation as to

Count IV (Unfair Competition); and

3)      DENIED in all other respects.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE

21